# United States District Court
### for the
### Eastern District of Tennessee



APR 2 5 2025

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

IN THE MATTER OF THE SEARCH OF
THE REAL PROPERTY ON WHICH LIES A
RESIDENCE LOCATED AT 5715
STARLIGHT ROAD KINGSPORT,
TENNESSEE 37660, INCLUDING ALL
OUTBUILDINGS, APPURTENANCES,
STORAGE AREAS AND VEHICLES WITHIN
THE CURTILAGE ASSOCIATED WITH THE
PROPERTY

)
)
)
)

Mag. No.: 2:25-MJ-_08_

## APPLICATION FOR A WARRANT BY
## TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Brian Vicchio, Task Force Officer of the U.S. Department of Justice, Drug Enforcement Administration, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location):*
**See Attachment A**
located in the Eastern District of Tennessee, there is now concealed *(identify the person or describe the property to be seized):* **See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

    ☒    evidence of a crime

    ☒    contraband, fruits of a crime, or other items illegally possessed;

    ☒    property designed for use, intended for use, or used in committing a crime

    ☐    a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of 21 U.S.C. §§ 846 and 841(a)(1), and the application is based on these facts: **See Attached Affidavit.**

    ☐    Continued on the attached sheet.

    ☐    Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

 

_____
TFO Brian Vicchio, DEA
*Applicant's signature*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____(specify reliable electronic means)

Date: __4/25/25__

_____
*Judge's signature*

City and State: Greeneville, Tennessee

CYNTHIA RICHARDSON WYRICK, U.S. Magistrate Judge
*Printed name and title*



IN THE MATTER OF THE SEARCH OF THE REAL )
PROPERTY ON WHICH LIES A RESIDENCE )
LOCATED AT **5715 STARLIGH ROAD** )
**KINGSPORT, TENNESSEE, 37660**, INCLUDING )
ALL OUTBUILDINGS, APPURTENANCES, )
STORAGE AREAS AND VEHICLES WITHIN THE )
CURTILAGE ASSOCIATED WITH THE PROPERTY )
(a photograph of the area in which the residence is )
located is attached hereto and fully incorporated within) )

2:25-MJ-068

TO BE SEALED

## **AFFIDAVIT FOR SEARCH WARRANT**

I, Brian Vicchio, Task Force Officer, United States Department of Justice, Drug Enforcement

Administration being duly sworn under oath, states as follows:

### **I. INTRODUCTION**

1. I, Brian Vicchio, am an investigative or law enforcement officer within the meaning of Section

   2510(7) of Title 18 of the United States Code, that is, an officer of the United States who is

   empowered by law to conduct investigations of, and to make arrests for, offenses enumerated

   in Section 2516 of Title 18 of the United States Code.

2. I am currently appointed as a Criminal Investigator at the Washington County Sheriff's

   Office and assigned as a Task Force Officer with the Drug Enforcement Administration.

   Prior to working at the WCSO, I was assigned to the 1st Judicial Drug Task Force within the

   Eastern District of Tennessee. Prior to the DTF, I was assigned to the Knoxville, Tennessee,

   office of the DEA at the Johnson City Post of Duty. I was a Task Force Agent with DEA for

   five and a half years. Prior to becoming a Task Force Agent with DEA, I worked as a police

   officer (K-9 Officer) for Johnson City Police Department in Johnson City, Tennessee, for

   approximately ten years. Prior to working as a Police Officer in Johnson City, Tennessee, I

   worked as a Police Officer for the City of Bluefield, West Virginia, for six years. I have had

experience and training in conducting investigations of criminal activity, including

debriefing of confidential sources about criminal activity, conducting surveillance of persons

involved in criminal activity, and conducting searches for evidence of criminal activity.

Such criminal activity includes trafficking in controlled substances. I have experience in

investigations utilizing Court ordered wiretaps. I am familiar with the methods of operation

and terminology used by persons involved in illegal drug distribution activities. In the

performance of my duties as a Task Force Agent, I have conducted many investigations

involving narcotics, drug trafficking, and other general criminal investigations through the

past twenty years involving violations of state and federal laws. I have been involved in the

detection and investigation of federal narcotic violations, including the sale, distribution,

importation, possession, and conspiracy to possess or sell and distribute various narcotic and

controlled substances, and the use of communication facilities, such as telephones, digital

telephone pagers, and other like facilities that are commonly used to facilitate narcotic

violations. I have received training in narcotic enforcement efforts, case development,

procedures, investigative techniques, asset forfeiture investigation, and other standardized

methods of investigation involving narcotic offenses from the DEA. I have investigated

many violations of the state and federal narcotic statutes during the past fifteen years in the

Eastern District of Tennessee, and, as a result, have been successful in arrests and

convictions of numerous individuals associated with narcotic distribution. As a result of

these investigations and prosecutions, I have become aware of various methods and

techniques utilized by individuals within the Eastern District of Tennessee and elsewhere in

order to sell and distribute various controlled substances. I have become familiar with

various codes, slang terms, and other terminology utilized by individuals within the Eastern

District of Tennessee to refer to controlled substances, such as cocaine and cocaine base. I

2

am aware that drug traffickers often "front" drugs, or distribute them without receiving immediate payment. I have consistently kept myself abreast of various narcotic violators and have received intelligence regarding narcotics violations from agents of the Tennessee Bureau of Investigation ("TBI") and local law enforcement authorities located in the Northeastern portion of the Eastern District of Tennessee and surrounding states. I have a total of approximately 29 years of law enforcement experience on the state and federal level.

3. Through the training and experience identified above, I have learned that trafficking in illegal drugs is an activity dependent upon communications. Drug traffickers need to stay in regular contact with sources of supply and customers, and as a result often make use of the latest in communications technology, such as cellular telephones. I have also learned that drug traffickers maintain records of sales, so that they can keep track of money that they owe to sources, and money that is owed to them by customers. These records can be maintained on mobile devices such as cell phones. Finally, I am aware that drug traffickers may utilize information technology to conduct transactions that evidence drug trafficking, either by communicating through a cell phone, or using the cell phone to make travel arrangements, payment arrangements, or purchase assets with the proceeds of drug transactions.

4. I have conducted numerous drug investigations utilizing various investigative techniques. Through these investigations, and my training, and experience, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, distribute narcotics, and collect and launder related proceeds. I am aware of the sophisticated tactics they routinely use to attempt to thwart any investigation of their organizations. I have authored numerous search warrants which have resulted in the seizure of controlled substances, items classified as unlawful drug paraphernalia, firearms and ammunition associated with illegal drugs, and other common evidence associated with illegal drugs. I

3

have also assisted in the prosecution of known drug offenders, as a result of the aforementioned experience, training, and investigative techniques.

5.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, have been committed, and are being committed, by Todd TREMBLEY and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7.  The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PURPOSE OF THE AFFIDAVIT

8.  This affidavit is submitted in support of an application for a search warrant authorizing the search of the residence located at **5715 Starlight Road Kingsport, Tennessee, 37660**. The description and the address to the residence are more fully described in Attachment A. The items to be searched and are believed to be present at the residence are more fully described in Attachment B.

4

9. The residence of Todd TREMBLEY is located at **5715 Starlight Road, Tennessee, 37660**. The premises is a single-wide mobile home with white siding and a red metal roof. There is a stone masonry mailbox marked 5715 located at the end of the driveway.

10. Based on the investigation and my training and experience, I believe that there will be evidence of drug trafficking and conspiracy to traffic drugs (specifically methamphetamine), in violation of Title 21 USC § 841 and 21 USC §846 at the residence on the property described in this affidavit. The information contained in this affidavit is based on personal observations, observations of other law enforcement officers, my review of official police and government reports, my review of records and documents gathered during this investigation, and consultation with other Agents involved in the investigation. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are essential to establish the necessary foundation for the search warrants.

11. Based upon my training, experience, and participation in this and other drug trafficking investigations involving the manufacture and distribution of controlled substances, I have reason to believe that:

       a.     Individuals involved in drug trafficking frequently conceal in their residences or the residences of relatives, caches of illicit drugs, large amounts of United States currency, and/or other illicit proceeds of drug transactions, as well as records of drug transactions;

       b.     Drug traffickers frequently keep, at their residences or the residences of associates, paraphernalia for packaging, mixing, "cutting", weighing, measuring and distributing controlled substances, and this paraphernalia often includes measuring scales, plastic bags, plastic shrink wrap, vials, and bottles;

5

c.      Drug traffickers commonly "front" (provide on consignment) controlled substances to their clients and that drug traffickers frequently keep written and/or electronic records of controlled substances obtained, sold and "fronted", as well as of monies owed and paid to drug customers and sources of supply;

d.      Drug traffickers commonly maintain addresses and/or telephone numbers in books, electronic databases or papers that reflect, names, addresses, and/or telephone numbers of their associates in the drug trafficking business;

e.      It is common practice for drug traffickers to travel to "purchase and distribution" areas to facilitate their trafficking; that after purchasing drugs, drug traffickers will transport or cause to be transported drugs to areas in which they intend to distribute the drugs; and that the methods of transportation include, but are not limited to commercial airlines, private aircraft, private and rental motor vehicles, and government and contract mail carriers; that evidence of such travel is often times maintained by drug traffickers in the form of airline receipts, bus tickets, automobile rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, logs, travel agency vouchers, notes, cellular telephone tolls, and records of long distance calls; and that drug traffickers often perform electronic/wire transfers of monies and assets to provide payment for drug purchases and operating costs of their drug transactions;

f.      Drug traffickers often take or cause to be taken photographs and video recordings of themselves, co-conspirators, assets and/or controlled substances and that they maintain these photographs and video recordings;

g.      Drug traffickers often keep U.S. currency in order to maintain and finance their ongoing drug business;

6

h.     Drug traffickers create large sums of United States currency as illicit proceeds and that, unlike illicit drugs which may be at a particular location for a relatively short period, this currency remains at drug and illegal business sites for extended periods of time;

i.     When drug dealers amass large sums of money from the sale of drugs they attempt to legitimize profits so as to avoid suspicion from law enforcement officials, seizure and forfeiture of such wealth, and to further avoid United States tax liability;

j.     Drug traffickers often hold assets in nominee names and that even though these assets are in nominee names, drug traffickers continue to use these assets exercising dominion and control over them;

k.     The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled substances;

l.     Drug dealers commonly have in their possession, or in their residences and businesses, firearms, including handguns, pistols, revolvers, shotguns, rifles, and other weapons. These weapons are used to protect and secure their property, drugs and illicit profits from robbers and thieves as drug dealers are often times the victims of robberies and "rip offs" during drug transactions. In addition, because such firearms are in demand by those in the drug trade, such items are often time bartered for drugs. Court decisions in criminal drug prosecutions have recognized that the presence of firearms is relevant and probative as such are tools of the drug trade;

m.     It is common for drug traffickers to secrete contraband and controlled substances, illicit proceeds of and operating capital for drug sales, and records

7

of drug transactions in secure locations within and on their residences and premises, residences of relatives and associates, motor vehicles, garages, outbuildings, containers, curtilage and/or other "stash" locations, which they feel to be secure, for ready access and to conceal these items from law enforcement officer;

n.     I have also learned that because of the ways in which various types of computer technologies operate in storing or processing records, in the experience of others who have conducted law enforcement training schools and seminars, that it is common to find that specific records authorized to be seized are inextricably mixed or that without employing difficult or extremely time-consuming procedures are inseparable from other records, programs, or files (similar to a bound-volume book containing financial records, addresses, a diary, and notes, for example). In that event, the storage medium containing items to be seized will be backed up (at the search scene, if reasonably feasible as stated above, or after removal from the premises) and in later analysis, the items authorized to be seized will be printed out or otherwise copied for evidence purposes. Upon completion of the analysis, the backup, tape, diskette, hard drive, etc., from which those evidence copies were made will be sealed and secured for future comparison with the evidence copies;

o.     Drug traffickers commonly utilize cellular communications to conduct their criminal activity are aware that law enforcement can utilize telephone records to generate evidence of wrongdoing, and so often store electronic communications relating to drug suppliers and drug customers in their phones, including but not limited to voice mails, text messages, and financial records

8

relating to that customer account; all of which constitute evidence of crimes, contraband, and property designed or intended for use or which is or has been used as the means of distributing and possessing with the intent to distribute controlled substances, and the use of communication facilities, to include the U.S. mail, to distribute and possess with the intent to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 843(b).

p.  The United States Court of Appeals for the Sixth Circuit has held that evidence of drug sales, such as books, records, letters of credit, and electronic media, are likely to be found where drug traffickers live. United States v. Mendizabel, 214 Fed. Appx. 496, 499-500 (6th Cir. Dec. 20, 2006) (citing United States v. Jones, 159 F.3d 969, 975 (6th Cir.1998)). See also United States v. Merrell, 2009 WL 1505262 (6th Cir. May 28, 2009); United States v. Anderson, 2009 WL 1474721 (6th Cir. May 26, 2009); United States v. Gunter, 551 F.3d 472, 481 (6th Cir. 2009). In United States v. Goward, 188 Fed Appx. 355 (6th Cir. Jul. 13, 2006), the court held that a search warrant affidavit containing credible, verified allegations of drug trafficking, verification that defendant lived at the residence, combined with the affiant-officer's experience that drug dealers keep evidence of dealing at their residence, even in the absence of any indication of any wrongdoing occurring at that residence, established probable cause for the issuance of a warrant to search defendant's residence. The court stated that "[w]e are inclined to . . . side with our sister Circuits in believing that it is a reasonable inference that "in the case of drug dealers, evidence is likely to be found where the dealers reside." Id. at 359 (citing United States v. Frazier, 423

9

F.3d 526, 537 (6th Cir.2005); and United States v. Miggins, 302 F.3d 384, 394 (6th Cir.2002) (citing cases from the First, Second, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits supporting the proposition that evidence of drug trafficking is likely to be found in the residence of the drug dealer)).

12. I have personally participated in this investigation and have received information from other investigators. I am fully familiar with the factual information and material which is contained within this Affidavit either as a result of my investigative efforts or through discussions with other investigators and agencies identified herein, who have provided information and evidence concerning this investigation.

## PROBABLE CAUSE

13. The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of Todd TREMBLEY and others regarding violations of 21 U.S.C. § 841(a)(1), distribution and possession with the intent to distribute methamphetamine, a Schedule II controlled substance, and 21 U.S.C. § 846, conspiracy to distribute and to possess with intent to distribute methamphetamine, a Schedule II controlled substance.

14. On November 12, 2024, Investigators from the Sullivan County Sheriff's Office began an investigation on Todd TREMBLEY following the arrest of Elizabeth BOLEN. On November 18, 2024, BOLEN agreed to cooperate with SCSO Investigators and after being read and signed a copy of BOLEN's Miranda Rights, BOLEN gave a statement to Investigators James Legg and Jacob Yeager. BOLEN stated that the methamphetamine that was found in the vehicle at the time of her arrest was purchased from "TODD", who lives off Stardust Road in Kingsport,

10

Tennessee. BOLEN was shown a social media profile picture for TODD and identified him as Todd TREMBLEY. (TREMBLEY was later fully identified by Investigators with an address of 5715 Starlight Road Kingsport, TN). BOLEN stated that she and her boyfriend, Zachary RICHARDS, were stopped on I-26 November 8, 2024, and were found to be in possession of several kilograms of methamphetamine. BOLEN stated that RICHARDS claimed possession of the methamphetamine and was charged. BOLEN stated that the methamphetamine was for TREMBLEY. BOLEN stated that she met TREMBLEY through RICHARDS and described herself as a "driver" for TREMBLEY. BOLEN stated that she picked up kilogram quantities for TREMBLEY one (1) or two (2) times per week for the past two (2) years. BOLEN stated that she has seen large amounts of methamphetamine at TREMBLEY's residence along with firearms (TREMBLEY is known by agents to be a convicted felon). BOLEN stated that TREMBLEY sells ounce quantities of methamphetamine for $400 to $500 per ounce. BOLEN stated that she can also purchase smaller quantities of methamphetamine from TREMBLEY and agreed to be used as a Confidential Source to make controlled purchases in the future (hereafter referred to as CS-1).

15. On November 26, 2024, Greene County Sheriff's Office Deputy Bryan Shelton conducted a traffic stop on a Silver Toyota 4Runner for a light law violation. Deputy Shelton made contact with the driver Thomas FRESHOUR. FRESHOUR was found to have two (2) outstanding warrants for his arrest. FRESHOUR was taken into custody for the warrants and a search of his person was conducted. FRESHOUR was found to be in possession of marijuana and methamphetamine which were located in the pocket of FRESHOUR's hoodie. FRESHOUR was asked if there was any illegal contraband in his vehicle in which he replied, "a lot." A search of the vehicle revealed 494 grams of methamphetamine, a small amount of heroin,

11

various pills and five (5) firearms. FRESHOUR was arrested and transported to the GCSO where he was read and signed a copy of his Miranda Rights. FRESHOUR agreed to speak with Agent Jake Little. FRESHOUR stated that all of the narcotics located in his vehicle were purchased from Todd TREMBLEY. FRESHOUR stated that he obtains large quantities of methamphetamine from TREMBLEY at 5715 Starlight Road Kingsport, TN.

16. On January 7, 2025, Drug Enforcement Administration (DEA) Johnson City Post of Duty (JCPOD) TFO Brian Vicchio and Washington County Sheriff's Office Sgt. David Tranbarger met and debriefed Washington County Sheriff's Office Confidential Source (hereafter referred to as CS-2) relative to the drug trafficking activities of Todd TREMBLEY. CS-2 stated that numerous people have been arrested in the past year who were large suppliers of methamphetamine and fentanyl. CS-2 stated that TREMBLEY has recently become one of the larger suppliers of methamphetamine and fentanyl. CS-2 stated that Rechelle GADDIS has agreed to introduce CS-2 to TREMBLEY for the purpose of future purchases of methamphetamine. GADDIS has provided prices for different quantities of methamphetamine. GADDIS stated $700 for two (2) ounces of methamphetamine, $1,500 per pound and $3,500 per kilogram of methamphetamine. GADDIS states through text messages on phone number 423-607-9499: that TREMBLEY has all the "clear" CS-2 can handle (based on training and experience agents know "clear" to be methamphetamine). TFO Vicchio will be utilizing CS-2 to make controlled purchases from TREMBLEY in the future.

17. On January 15, 2025, at approximately 1:29 pm, DEA JCPOD TFO Vicchio and Investigator Tranbarger, met and debriefed CS-2 regarding a subsequent meeting with Rechelle GADDIS to purchase approximately two (2) ounces of suspected methamphetamine. GADDIS

12

advised CS-2 that he/she would be introduced to GADDIS's source of supply TREMBLEY.

CS-2 called GADDIS on phone number 423-607-9499. GADDIS advised CS-2 to meet at the

Dollar Store off of 93, which is located at 4355 Sullivan Gardens Pkwy. Kingsport, TN. At

approximately 2:25 pm, Agents observed GADDIS in a Black Chevrolet Cruz bearing TN

registration 983 BNKK (Registered to Rechelle GADDIS) in the area of the Dollar General

Store. GADDIS was followed to 5715 Starlight Road Kingsport, TN (the residence of Todd

TREMBLEY.) At approximately 2:34 pm, CS-2 arrived at the Dollar General Store. At

approximately 2:39 pm, GADDIS was observed leaving TREMBLEY's residence. GADDIS

was surveilled from TREMBLEY's residence to the Dollar General Store where she met with

CS-2 at approximately 2:41 pm. GADDIS was observed on the audio video device counting out

$700 and giving CS-2 two (2) baggies containing a clear crystal substance believed to be

methamphetamine. At approximately 3:05 pm, TFO Vicchio and Sgt. Tranbarger met with CS-

2 at a predetermined location whereupon the CS relinquished custody of two (2) ounces of

suspected methamphetamine

18.     On January 29, 2025, at approximately 3:00 pm, DEA JCPOD TFO Vicchio and

Investigator Tranbarger, met and debriefed CS-2 regarding a subsequent meeting with

GADDIS to purchase approximately four (4) ounces of suspected methamphetamine. At

approximately 4:00 pm, GADDIS contacted CS-2 via Facebook Messenger and advised CS-

2 to meet at the Dollar Store off of 93, which is located at 4355 Sullivan Gardens Pkwy.

Kingsport, TN. CS-2 then traveled to 4355 Sullivan Gardens Pkwy. Kingsport, TN and

arrived there at approximately 4:43 pm. At approximately 6:30 pm, GADDIS contacted

CS-2 and advised that she, GADDIS, had the package and would be there to meet soon. At

approximately 6:39 pm, GADDIS was observed in her black Chevrolet Cruz arriving at

13

5715 Starlight Road Kingsport, TN, the residence of TREMBLEY. At approximately 7:00

pm, GADDIS was observed leaving TREMBLEY's residence. GADDIS was surveilled

from TREMBLEY's residence to the Dollar General Store where she met with CS-2 at

approximately 7:06 pm. GADDIS was observed exiting the Chevrolet Cruz and walking

over and entering the CS's vehicle where the money and methamphetamine was exchanged

which was monitored via the video and audio device. At approximately 7:20 pm, TFO

Vicchio and Sgt. Tranbarger met with CS-2 at a predetermined location whereupon the CS-2

relinquished custody of four (4) ounces of suspected methamphetamine.


19.    On February 26, 2025, at approximately 2:00 pm, DEA JCPOD TFO Vicchio and

Investigator Tranbarger, met and debriefed CS-2 regarding a subsequent meeting with

GADDIS to purchase approximately four (4) ounces of suspected methamphetamine. CS-2

then traveled to 4355 Sullivan Gardens Pkwy. Kingsport, TN and arrived there at

approximately 2:43 pm. At approximately 2:50 pm, GADDIS was observed in her black

Chevrolet Cruz arriving at 5715 Starlight Road Kingsport, TN, the residence of

TREMBLEY. At approximately 2:53 pm, GADDIS was observed leaving TREMBLEY's

residence. GADDIS was surveilled from TREMBLEY's residence to the Dollar General

Store where she met with CS-2 at approximately 2:57 pm. GADDIS was observed exiting

the Chevrolet Cruz and walking into the Dollar General Store. CS-2 walked over to

GADDIS's vehicle and entered the passenger front door. While monitoring the audio and

video device, agents observed a small child in GADDIS's vehicle. The child was crying and

asking for their mommy. CS-2 attempted to calm the child and told the child that "mommy

will be right back, she is in the store." At approximately 3:07 pm, GADDIS exits the Dollar

Store and reenters her vehicle with CS-2 and the money and methamphetamine was

14

exchanged which was monitored via the video and audio device. At approximately 3:16 pm, TFO Vicchio and Sgt. Tranbarger met with CS-2 at a predetermined location whereupon CS-2 relinquished custody of four (4) ounces of suspected methamphetamine.

20. On this same date Sullivan County Sheriff's Office conducted a controlled purchase of 1 ounce of methamphetamine from TREMBLEY with the use of CS-1. At approximately 5:05 pm, SCSO Investigators met with CS-1 who had prearranged the purchase of three (3) ounces of methamphetamine from TREMBLEY. The CS was briefed and was given SCSO Official Advanced Funds (OAF) and an audio and video recording device. CS-1 then traveled to 5715 Starlight Road Kingsport, TN the residence of TREMBLEY. At approximately 5:18 pm, CS-1 arrived at TREMBLEY's residence. TREMBLEY's girlfriend Amy DANIELS was observed walking out of the residence and meeting with CS-1 at CS-1's vehicle. At approximately 5:21 pm, DANIEL's was observed walking back into the residence as CS-1 remained in the vehicle. At approximately 5:24 pm, DANIELS comes back out of the residence and goes to the driver's window of CS-1's vehicle where the exchange took place through the window of CS-1's vehicle. DANIELS was then observed placing something in the front pocket of her sweatshirt. At approximately 5:27 pm, CS-1 leaves the residence and met with SCSO investigators at a predetermined location whereupon CS-1 relinquished custody of the purchased methamphetamine. CS-1 advised during the debrief that only one (1) ounce of methamphetamine was purchased rather than the 3 that was originally asked for. At approximately 5:43 pm, TFO Vicchio, WCSO Sgt. Tranbarger and SA Daniel van Heemstede Obelt met with SCSO Investigators Shannon Russell and James Legg where Inv. Legg turned over the purchased one (1) ounce of methamphetamine to TFO Vicchio.

15

21.     On January 20, 2025, a SCSO Pole Camera was installed at 5715 Starlight Road Kingsport, TN. The pole camera has been utilized to assist Agents in surveillance at TREMBLEY's residence. Agents have been able to surveil co-conspirators at TREMBLEY's residence along with monitoring the controlled purchases that have been made at the residence. Agents have observed GADDIS at the residence several times during the months of February and March 2025 not including the times which the controlled purchases were taking place. GADDIS has been observed there as recently as the last week of March on two separate occasions. GADDIS is known to reside at 3027 Mayfield Drive Johnson City, Tennessee. GADDIS entered the residence for a brief period then left. I know that quick stops at residences, such as this one, can be indicative of drug trafficking. Further I know that Rechelle GADDIS is a drug trafficker. Agents have observed the high traffic volume at the residence at certain times with quick stops which, through training and experience as well as knowledge of this investigation, is the belief of your affiant to be indicative of drug trafficking. The high traffic volume with quick stops continues to occur up to this date.

22.     On April 8, 2025, TFO Vicchio was able to develop an additional Confidential Source in reference to this case (hereafter referred to as CS-3). CS-3 stated that they have one (1) source of supply, Todd TREMBLEY. CS-3 stated they have been purchasing methamphetamine from TREMBLEY for the past year and a half. CS-3 stated that they have purchased 4 ounces of methamphetamine at a time for $1,200. CS-3 stated the usual amount purchased is a quarter ounce (7 grams) for $100. CS-3 stated that Amy DANIELS lives with TREMBLEY at 5715 Starlight Road in Kingsport, TN. CS-3 stated when purchasing smaller amounts of methamphetamine, CS-3 deals with DANIELS. When

16

purchasing larger amounts of methamphetamine, CS-3 deals with TREMBLEY. CS-3 stated

either way, TREMBLEY always advises DANIELS of the price for the purchased

methamphetamine. CS-3 stated they have seen large amounts of methamphetamine at

TREMBLEY's residence. CS-3 stated they have seen at least 12 to 13 ounces of

methamphetamine at one time approximately 1 month ago. CS-3 has agreed to assist

Agents by making controlled purchases from TREMBLEY in the future.


23.     On April 9, 2025, at approximately 4:15 pm, Drug Enforcement Administration

Brian Vicchio and TFO Matthew Cole, met and debriefed WCSO Confidential Source

(hereinafter referred to as CS-3) regarding a subsequent meeting with Todd TREMBLEY to

pay back Todd TREMBLEY for a "fronted amount" of suspected methamphetamine. CS-3

stated that he/she would travel to 5715 Starlight Road Kingsport, TN to meet with Todd

TREMBLEY and Amy DANIELS to pay back a debt of $25 which was owed from an

amount of methamphetamine that was "fronted" to CS-3 on April 5, 2025. At approximately

4:30 pm, TFO Brian Vicchio provided CS-3 with $40 WCSO Official Advanced Funds

(OAF). At approximately 4:32 pm, TFO Brian Vicchio provided CS-3 with one (1)

audio/video recording device. The purpose for providing the device was to record and

monitor the person-to-person conversation between CS-3 and TREMBLEY and DANIELS.

At approximately 4:40 pm, TFO Vicchio and TFO Matthew Cole observed CS-3 depart the

predetermined neutral location. CS-3 then traveled to 5715 Starlight Road Kingsport, TN

(the residence of TREMBLEY and DANIELS) and arrived there at approximately 5:20 pm.

At approximately 4:45 pm, CS-3 was observed exiting his/her vehicle and walking inside

and entering TREMBLEY's residence. CS-3 was monitored by the audio/ video device

while inside of the residence. During the meeting, CS-3 was heard paying back the owed

17

drug debt and conversing with both DANIELS and TREMBLEY. CS-3 and TREMBLEY discussed future purchases of methamphetamine while TREMBLEY weighs out an additional amount of methamphetamine which was again "fronted" to CS-3. At approximately 5:45 pm, CS-3 was observed leaving TREMBLEY's residence. CS-3 was then directed by TFO Vicchio to meet at a pre-determined location whereupon CS-3 relinquished custody of the fronted amount of suspected methamphetamine.

24.     On April 22, 2025, at approximately 3:10 pm, Drug Enforcement Administration (DEA) Johnson City Post of Duty (JCPOD) TFO Brian Vicchio and Sgt. David Tranbarger, met and debriefed WCSO Confidential Source, CS-3, regarding a subsequent meeting with Todd TREMBLEY to purchase 2 ounces of methamphetamine. CS-3 stated that he/she would travel to 5715 Starlight Road Kingsport, TN to meet with Todd TREMBLEY and Amy DANIELS to purchase 2 ounces of methamphetamine for $700. At approximately 3:12 pm, TFO Brian Vicchio provided CS-3 with $700 DEA Official Advanced Funds (OAF). At approximately 3:13 pm, TFO Brian Vicchio provided CS-3 with one (1) audio/video recording device. The purpose of providing the device was to record and monitor the person-to-person conversation between CS-3 and TREMBLEY and DANIELS. At approximately 3:15 pm, TFO Vicchio and Sgt. David Tranbarger observed CS-3 depart the predetermined neutral location. CS-3 then traveled to 5715 Starlight Road Kingsport, TN (the residence of TREMBLEY and DANIELS) and arrived there at approximately 3:30 pm. CS-3 was monitored by the audio/ video device while inside of the residence. During the meeting, CS-3 was heard purchasing the methamphetamine and conversing with Amy DANIELS. CS-3 and DANIELS discussed future purchases of methamphetamine. DANIELS discussed several different couriers that she, DANIELS, and

18

TREMBLEY have been utilizing to pick up large amounts of methamphetamine. At approximately 3:52 pm, CS-3 was observed leaving TREMBLEY's residence. CS-3 was then directed by TFO Vicchio to meet at a pre-determined location whereupon CS-3 relinquished custody of the purchased 2 ounces of methamphetamine.

## CONCLUSION

25.    Based upon the foregoing, I believe that Todd TREMBLEY, Amy DANIELS and others known and unknown are engaged in the unlawful distribution and possession with intent to distribute methamphetamine and other controlled substances and evidence of their drug trafficking activity is likely to be found upon the premises described above and that such evidence of crimes, contraband and fruits of crime, and property used in the commission of such crimes as listed in Attachment B. Based upon the history of this criminal enterprise that I believe is being operated by TREMBLEY, it is expected that officers will find other items as listed in Attachment B.

WHEREFORE, I respectfully submit that there is probable cause to believe that there is evidence of unlawful drug trafficking at the property listed below, including outbuildings, workshops, appurtenances, storage areas, vehicles and structures related to specific properties at **5715 Starlight Road Kingsport, Tennessee, 37660.**

I respectfully request that the court issue a warrant authorizing the search of the described property, including any and all outbuildings, workshops, appurtenances, storage areas, safes, lockboxes, structures, and vehicles described. Furthermore, I have only used that information

19

Brian Vicchio
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
On April 25 , 2025:

CYNTHIA RICHARDSON WYRICK
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A
### (DESCRIPTION OF RESIDENCE)

**5715 Starlight Road Kingsport, Tennessee.** The premises is a single-wide mobile home with white siding and a red metal roof. There is a stone masonry mailbox marked 5715 located at the end of the driveway at the roadway. (when viewing the house from the front)



21



22

## ATTACHMENT B

The items to be seized are evidence of violations of 21 U.S.C. §§ 841 (a) (1) and 846, and 18 U.S.C. §§ 1956 and 1957, including specifically the following:

1. Any items pertaining to the illegal possession with the intent to distribute methamphetamine, including documents such as telephone records indicating telephone communications to co-conspirators, drug customers and drug suppliers; express or overnight mail receipts, money, books, records, receipts, schedules, tickets, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances; address books, telephone books, computerized records and papers reflecting names, addresses and telephone numbers of drug customers and suppliers used to facilitate the distribution of controlled substances; books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks, receipts, passbooks, bank checks, and deposit bank records, all of which evidence the obtaining, transferring, and concealment of the proceeds of and assets associated with drug trafficking; United States currency, precious metals, and financial instruments, including, but not limited to stocks and bonds, and vehicle title documents which constitute the proceeds of drug trafficking and which constitute the operating capital for continued drug trafficking; photographs of drug customers and suppliers and other coconspirators in the drug trafficking trade; photographs of assets acquired from the sale of controlled substances associated with the drug trafficking trade; all of which constitutes evidence of the commission of the above criminal offenses, and that are currently being used by Todd TREMBLEY and/or Amy DANIELS in violation of 21 U.S.C. §§ 846 and 841(a)(1), 841(b)(1)(A).

### LIMITATION ON SEIZURE OF ELECTRONIC DEVICES:
If law enforcement officers executing this warrant encounter electronic devices including computers, cell phones, storage media, etc. and a third party other than the previously identified occupant listed in the affidavit claims ownership, law enforcement may seize the devices if needed,

23

but shall not search them without re-applying for a search warrant. If the third-party consents to a search, this limitation does not apply. This limitation applies to all electronics described in Attachments A & B.

24